OPINION
{¶ 1} Rafik Bandy appeals his convictions on two counts of Grand Theft and one count of Forgery in the Lake County Court of Common Pleas. For the following reasons, we affirm the decision of the court below.
 {¶ 2} On January 19, 2007, Bandy was indicted on two counts of Grand Theft of a Motor Vehicle, felonies of the fourth degree in violation of R.C. 2913.02(A)(3), and one count of Forgery, a felony of the fourth degree in violation of R.C. 2913.31(A)(3). *Page 2 
 {¶ 3} The charges against Bandy arise from the following incidents. Kevin Gibson, of Eastlake, Ohio, had advertised a 2004 Honda CV-R 1000RR for sale in Cycle Trader Magazine. On June 26, 2006, Gibson received a call from a person identifying himself as "Ryan." Gibson and "Ryan" negotiated a sale price of $8,500, payable by cashier's check. At about 7:00 p.m., "Ryan" arrived at Gibson's residence and tendered a Charter One Bank cashier's check for $8,500 in exchange for the motorcycle.
 {¶ 4} The cashier's check was subsequently dishonored as being fraudulent. Gibson contacted the Eastlake Police and gave a description of "Ryan" as being "half black, half white, a hundred and sixty pounds, five ten, about twenty to twenty-five years old." Patrolman James Perkins investigated the matter by running the VIN number of Gibson's motorcycle through the LEADS computer. Perkins eventually learned that the motorcycle had been registered to a Euclid resident named Benny Wilson.
 {¶ 5} Through Wilson, Bandy became a suspect in the investigation. On July 11, 2006, Patrolman Perkins, along with Wilson and Detectives Christopher Bowersock and Ted Kroczak, went to Bandy's residence in Cleveland Heights. Bandy initially denied having any knowledge about Gibson's motorcycle and was upset about the officers' presence on his property. Bandy became belligerent toward Bowersock, who handcuffed him until he settled down. At one point, Cleveland Heights and East Cleveland Police Officers were present at Bandy's residence.
 {¶ 6} Kroczak then asked to speak with Bandy alone and was able to obtain a written statement from him. In this statement, Bandy admitted to giving the title to Gibson's motorcycle to Wilson. However, Bandy stated that he had obtained the title *Page 3 
from an unknown person he had met in a park. The unknown person offered to sell Bandy a motorcycle. When Bandy declined the offer, the unknown person gave Bandy the title and asked him to ask his friends if they would be interested in purchasing the motorcycle. According to the written statement, Bandy never saw Gibson's motorcycle.
 {¶ 7} Patrolman Perkins observed that Bandy met the physical description provided by Gibson. While still present at Bandy's residence, Perkins telephoned Gibson and directed him to the Eastlake Police Station to view a photo array of potential suspects. Patrolman Timothy Thompson generated the photo array by computer. After speaking with Wilson but before going to Bandy's residence, Detectives Bowersock and Kroczak had entered Bandy's physical characteristics into a computer, which, based on those characteristics, selected five other persons with similar characteristics. Gibson identified Bandy as the person who had given him the fraudulent check for his motorcycle. Thereupon, Bandy was placed under arrest.
 {¶ 8} Jeremiah Trench, of Painesville, had advertised a 2000 Honda CR 250 for sale in Cycle Trader Magazine. On June 26, 2006, Trench received a call from a person identifying himself as "Mike" and negotiated a sale price of $2,000, payable by cashier's check, plus an additional $50 for delivery of the motorcycle.
 {¶ 9} On June 27, 2006, at about 10:00 a.m., Trench met "Mike" at a park on Tarkington Avenue in Cleveland. "Mike" tendered a Charter One Bank cashier's check for $2,050 in exchange for the motorcycle.
 {¶ 10} The cashier's check was subsequently dishonored as being fraudulent.
 {¶ 11} On July 18, 2006, Bandy appeared for a preliminary hearing in Willoughby Municipal Court in connection with the theft of Gibson's motorcycle. Trench, an *Page 4 
employee of the City of Willoughby, was working at the court building that day. Certain court employees, familiar with the circumstances of the theft of Trench's motorcycle, recognized the similarity with the Bandy case and informed Trench. Although Bandy was no longer present at the court, Trench was shown the photo array that Gibson had viewed earlier and identified Bandy as the person who had given him the fraudulent cashier's check.
 {¶ 12} Bandy was arraigned on January 26, 2007, and pled not guilty to the charges. Trial was set for March 12, 2007.
 {¶ 13} On March 6, 2007, Bandy, through counsel, filed a Motion for Severance of Offenses for Trial, on the grounds that he would be prejudiced by the joint trial for both thefts. Also on March 6, 2007, Bandy filed a Motion for Public Payment of Expert, requesting public funds to retain an expert on the issue of Gibson and Trench's identification of Bandy.
 {¶ 14} On March 7, 2007, Bandy filed a Motion to Suppress the pre-trial identifications by Gibson and Trench, and seeking to preclude Gibson and Trench from making in-court identifications during trial, on the grounds that the photo array was unduly suggestive.
 {¶ 15} Prior to trial, the lower court denied all of Bandy's motions as "untimely filed," inasmuch as they were more than thirty-five days after arraignment and less than seven days prior to trial. Crim.R. 12(D) ("[a]ll pretrial motions * * * shall be made within thirty-five days after arraignment or seven days before trial").
 {¶ 16} Bandy's trial took place on March 12 and 13, 2007. The jury found him guilty on the three counts charged in the indictment. *Page 5 
 {¶ 17} On April 26, 2007, the trial court held a sentencing hearing. The court sentenced Bandy to a six-month prison sentence for each count of Grand Theft and for the count of Forgery, all sentences to be served concurrently for an aggregate sentence of six months. The court ordered Bandy to pay restitution to the Lake County Clerk of Courts in the amount of $8,500 on behalf of the victim, Kevin L. Gibson, and in the amount of $2,050 on behalf of the victim, Jeremiah Trench.
 {¶ 18} Bandy timely appeals and raises the following assignments of error:
 {¶ 19} "[1.] The Trial Court erred by amending Count Two of the indictment in violation of Section 10 of Article 1 of the Constitution of Ohio and Rule 7(D) of the Ohio Rules of Criminal Procedure.
 {¶ 20} "[2.] Defendant-appellant was denied the right to effective assistance of counsel as guaranteed by Article I, Section 10 of the Ohio Constitution and the Sixth and Fourteenth Amendments to the United States Constitution."
 {¶ 21} In his first assignment of error, Bandy argues the trial court erred by amending Count 2 of the Indictment, originally charging Bandy with fifth-degree Forgery. The indictment referenced R.C. 2913.31(A)(3), which prohibits a "person, with purpose to defraud, or knowing that the person is facilitating a fraud" from "[u]tter[ing], or possess[ing] with purpose to utter, any writing that the person knows to have been forged." "Forgery is a felony of the fifth degree" unless "the value of the property * * * is five thousand dollars or more and is less than hundred thousand dollars," in which case Forgery is a felony of the fourth degree. R.C. 2913.31 (C)(1)(b)(i). Although the indictment correctly indicated that the value of the property was between $5,000 and $100,000, the degree of the crime was incorrectly stated as fifth-degree Forgery. *Page 6 
 {¶ 22} While preparing the jury instructions during trial, the trial court noticed the error in the indictment and, over defense counsel's objection, amended the indictment. The trial court characterized the mistake as a "scrivener's error" and noted there was no dispute that the amount of the forged check delivered to Gibson was over $5,000, as charged in the indictment. Thus, the nature of the charge did not change.
 {¶ 23} Section 10, Article I of the Ohio Constitution provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on presentment or indictment of a grand jury." "This provision guarantees the accused that the essential facts constituting the offense for which he is tried will be found in the indictment of the grand jury." State v Headley (1983), 6 Ohio St.3d 475,478, citing Harris v. State (1932), 125 Ohio St. 257, 264; State v.Joseph, 73 Ohio St.3d 450, 456, 1995-Ohio-288 ("the indictment must adequately inform the defendant of the charge against him").
 {¶ 24} "The court may at any time before, during, or after a trial amend the indictment, information, complaint, or bill of particulars, in respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged." Crim.R. 7(D). This court has held "an indictment may be amended to correct a clerical error so long as it does not change the identity of the offense." State v.Coughlin, 11th Dist. No. 2006-A-0026, 2007-Ohio-897, at ¶ 38, quotingState v. Earle (1997), 120 Ohio App.3d 457, 467.
 {¶ 25} A trial court's decision to amend an indictment is reviewed under an abuse of discretion standard. State v. Perales, 5th Dist. No. 06-CA-A-12-0093, 2008-Ohio-58, *Page 7 
at ¶ 140 (citation omitted); State v. Beach, 148 Ohio App.3d 181,2002-Ohio-2759, at ¶ 23 (citation omitted); State v. Mundy (1994),99 Ohio App.3d 275, 313.
 {¶ 26} In the present case, we find no abuse of discretion in the trial court's decision to amend the indictment and correct a clerical error. The true identity of the offense, fourth-degree Forgery, was properly described in the indictment with respect to the essential elements of that crime. Although the indictment correctly described fourth-degree Forgery, it misidentified the degree of the offense. The degree of an offense is not an element which must be proven or contained in the indictment. Cf. State v. Childs, 88 Ohio St.3d 558, 566,2000-Ohio-425 ("[a] valid indictment need not notify the defendant of the sentencing possibilities to which he is exposed except in a general way") (citation omitted). Contrary to Bandy's position, the severity of the offense was not increased by the amendment of the indictment nor was the identity of the crime changed. Rather, the indictment was changed to correct a clerical error and to accurately reflect the severity of the offense described in the indictment. Coughlin, 2007-Ohio-897, at ¶ 39
(amending the indictment to correctly identify the severity of the crime charged as a second-degree misdemeanor did not change the identity of the offense); State v. Rupp, 12th Dist. No. CA2001-06-135, 2002-Ohio-1600, at ¶ 21 (amending the indictment to identify the severity of the crime charged as a third degree felony did not change the identity of the offense).
 {¶ 27} The first assignment of error is without merit.
 {¶ 28} In the second assignment of error, Bandy maintains he was deprived of constitutionally effective assistance of counsel at the trial level. *Page 8 
 {¶ 29} The Ohio Supreme Court has adopted a two-part test to determine whether an attorney's performance has fallen below the constitutional standard for effective assistance. To reverse a conviction for ineffective assistance of counsel, the defendant must prove "(1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceeding." State v. Madrigal, 87 Ohio St.3d 378, 388-389,2000-Ohio-448, citing Strickland v. Washington (1984), 466 U.S. 668,687-688. "To warrant reversal, `[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" State v.Stojetz, 84 Ohio St.3d 452, 457, 1999-Ohio-464, citingStrickland, 466 U.S. at 694; State v. Bradley (1989), 42 Ohio St.3d 136, paragraph three of the syllabus.
 {¶ 30} Bandy cites to the following instances where trial counsel's performance fell below an objective standard of reasonableness: the failure to timely file a motion for severance; the failure to timely file a motion for public payment of an expert; the failure to timely file a motion to suppress; the failure to attempt to suppress Bandy's written statement; the failure to object to irrelevant, prejudicial testimony; and the failure to request jury instructions on eyewitness identification. Bandy asserts that these errors, both individually and collectively, deprived him of a fair trial.
 {¶ 31} We begin by considering the three untimely motions filed by trial counsel. Typically, the decision not to file a motion to suppress or other pre-trial motion, or to withdraw such a motion does not constitute ineffective assistance of counsel "when doing so was a tactical decision, there was no reasonable probability of success, or *Page 9 
there was no prejudice to the defendant." State v. Nields,93 Ohio St.3d 6, 34, 2001-Ohio-1291 (citations omitted). In the present case, the filing of un-timely pre-trial motions cannot be considered a tactical decision or sound trial strategy. Trial counsel demonstrated his belief that these motions had merit by the fact that he renewed the motions during trial. However, trial counsel failed to offer any explanation as to why the motions were untimely or to seek the court's leave for an extension of time for filing the motions. Cf. Crim.R. 12(D) ("[t]he court in the interest of justice may extend the time for making pretrial motions"). Thus, trial counsel's conduct fell below an objective standard of reasonable representation with respect to the pre-trial motions. State v. Scott, 12th Dist. No. CA2005-12-134, 2007-Ohio-1094, at ¶ 18; State v. Yates, 166 Ohio App.3d 19, 2006-Ohio-1424, at ¶¶ 2-10.
 {¶ 32} We must then consider the merit of these motions to determine whether Bandy has suffered prejudice.
 {¶ 33} "Two or more offenses may be charged in the same indictment * * * in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Crim.R. 8(A). Here, the thefts of Gibson and Trench's motorcycles were of a very similar character in regard to the time and manner in which the offenses were committed. The forged cashier's checks used to obtain the motorcycles contained the same routing and account numbers and sequential check numbers. *Page 10 
 {¶ 34} "If it appears that a defendant * * * is prejudiced by a joinder of offenses * * * the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires." Crim.R. 14.
 {¶ 35} "A defendant claiming error in the trial court's refusal to allow separate trials of multiple charges under Crim.R. 14 has the burden of affirmatively showing that his rights were prejudiced; he must furnish the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial, and he must demonstrate that the court abused its discretion in refusing to separate the charges for trial." State v. Torres,66 Ohio St.2d 340, at syllabus. As the basis for his motion for severance, Bandy claimed that a consolidated trial would prejudice him because it would allow the jury to consider "other acts" and "propensity" evidence, otherwise inadmissible if the charges were tried separately, and because it would be difficult for the jury to keep the evidence of each alleged act distinct. State v. Schaim, 65 Ohio St.3d 51, 59, 1992-Ohio-31
("[t]he admissibility of other acts evidence is carefully limited because of the substantial danger that the jury will convict the defendant solely because it assumes that the defendant has a propensity to commit criminal acts, or deserves punishment regardless of whether he or she committed the crime charged in the indictment").
 {¶ 36} "When a defendant claims that he was prejudiced by the joinder of multiple offenses, a court must determine (1) whether evidence of the other crimes would be admissible even if the counts were severed, and (2) if not, whether the evidence of each crime is simple and distinct." Id. If the State can demonstrate that the evidence of each crime is simple and direct, "an accused is not prejudiced by joinder *Page 11 
regardless of the nonadmissibility of evidence of these crimes as `other acts' under Evid. R. 404(B)." State v. Lott (1990), 51 Ohio St.3d 160,163 (citation omitted); State v. Brinkley, 105 Ohio St.3d 231,2005-Ohio-1507, at ¶ 30.
 {¶ 37} Here, the evidence against Bandy with respect to each count of Theft was simple and direct. The State's case essentially rested upon the eyewitness identification of Bandy by Gibson and Trench as the man who defrauded them of their motorcycles through forged cashier's checks. Although the jury heard some of the details of the investigation of the crimes and of the fortuitous circumstances in which Trench came to identify Bandy, these details do not obfuscate the simple and direct proofs on which Bandy's convictions rest. Accordingly, Bandy suffered no conceivable prejudice as a result of trial counsel's failure to timely file a motion for severance of the charges.
 {¶ 38} Bandy also filed a motion to retain an identification expert at public expense. Bandy's motion identified Dr. Solomon Fulero as the desired expert to testify about the inaccuracies and unreliability of eyewitness testimony. At trial, Bandy's counsel admitted that he had not actually contacted Dr. Fulero and offered no details as to the substance of Dr. Fulero's expected testimony.
 {¶ 39} Regarding the provision of expert witnesses to indigent defendants, the Ohio Supreme Court has held as follows: "Due process, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution, requires that an indigent criminal defendant be provided funds to obtain expert assistance at state expense only where the trial court finds, in the exercise of a sound discretion, that the defendant has made a particularized showing (1) of a *Page 12 
reasonable probability that the requested expert would aid in his defense, and (2) that denial of the requested expert assistance would result in an unfair trial." State v. Mason, 82 Ohio St.3d 144,1998-Ohio-370, at syllabus.
 {¶ 40} Regarding expert testimony with respect to eyewitness identification, the Ohio Supreme Court has held that such testimony is admissible, under Evid.R. 702, "concerning the variables or factors that may impair the accuracy of a typical eyewitness identification."State v. Buell (1986), 22 Ohio St.3d 124, 131 (emphasis sic). However, such testimony is not admissible "regarding the credibility of aparticular witness' identification testimony, absent some special identifiable need for the testimony." Id. (emphasis sic).
 {¶ 41} Although expert testimony on the accuracy of eyewitness identifications is generally admissible, it does not follow that an indigent defendant is automatically entitled to such an expert at public expense. "When a trial court entertains an indigent defendant's motion for the appointment of an expert at the State's expense, it acts as the guardian of public funds, an increasingly scarce resource. It is not unreasonable to require the defendant to show with some particularity that the expenditure of public funds will have a sufficient potential to affect the outcome of the trial to justify the expenditure." State v.Saylor (May 12, 1995), 2nd Dist. No. 94-CA-10, 1995 Ohio App. LEXIS 1921, at *16.
 {¶ 42} "[E]ven in cases where an indigent defendant establishes the value of expert assistance to his defense, a court still does not abuse its discretion by refusing to provide the accused with state-funded expert assistance when there are other adequate means available which obviate the need for such assistance." State v. Booker (Nov. 24, *Page 13 
1999), 2nd Dist. No. 17709, 1999 Ohio App. LEXIS 5551, at *11. "Such adequate means include vigorous cross-examination of the state's eyewitnesses, the opportunity by defense counsel to comment on their testimony during closing argument, and court instructions on factors jurors may consider in assessing eyewitness testimony." State v.Dewitt, 2nd Dist. No. 21620, 2007-Ohio-3437, at ¶ 67 (citation omitted).
 {¶ 43} In the present case, Bandy sought expert testimony on circumstances that generally impair the reliability of eyewitness identification. Although a valid purpose, it falls short of demonstrating that such testimony was essential to guaranteeing a fair trial. A similar conclusion is reached by the Ohio Supreme Court inState v. Madrigal, 87 Ohio St.3d 378. In Madrigal, the appellant claimed ineffective assistance of counsel where trial counsel failed "to obtain an expert to testify on the weakness of eyewitness testimony." Id. at 390. Although eyewitness testimony played "an important role" in the State's case, "[n]othing in the record indicate[d] what kind of testimony an eyewitness identification expert could have provided," and trial counsel preferred "to rely on * * * cross-examination of the witnesses in order to impeach the eyewitnesses." Id. at 390-391. The Supreme Court concluded that, in these circumstances, the alleged error did not render trial counsel constitutionally ineffective or the result of the trial unreliable. Cf. State v. Sargent, 169 Ohio App.3d 679,2006-Ohio-6823, at syllabus ("[t]he trial court abused its discretion and violated the defendant's due process rights in overruling the defendant's motion to appoint an eyewitness-identification expert: the crux of the state's case was the reliability of the victim's eyewitness identification of the defendant, and the state had virtually no other evidence tying the defendant to the charged offenses"). *Page 14 
 {¶ 44} The third untimely motion filed by Bandy's trial counsel was a motion to suppress the eyewitness identification of Bandy by Gibson and Trench. The basis for this motion is that the photo array used in the out-of-court identification of Bandy was unnecessarily suggestive and prejudicial, thus tainting any identification of Bandy by Gibson and Trench. Bandy asserts that his photograph used in the array was taken from a closer distance than the other photographs and, therefore, his face is larger and more prominent than the others. Bandy also complains that, although Gibson described the perpetrator as "half black, half white," the other photographs in the array depicted men of "considerably darker complexion" than Bandy. Finally, Bandy asserts the identification procedure was unduly suggestive because Trench was informed, prior to making the identification, that the suspect in custody's photograph was included in the array.
 {¶ 45} The United States Supreme Court has approved the use of photographic arrays in initial identifications as "used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs." Simmons v. United States (1968), 390 U.S. 377, 384. The Court held that "each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Id. *Page 15 
 {¶ 46} "When a witness has been confronted with a suspect before trial, due process requires a court to suppress her identification of the suspect if the confrontation was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under all the circumstances." State v. Waddy (1992), 63 Ohio St.3d 424, 438; State v.Elersic, 11th Dist. No. 2002-L-172, 2004-Ohio-5301, at ¶ 89 ("before identification testimony will be suppressed, the court must find that the procedure employed by the police was so impermissibly suggestive as to give rise to the substantial likelihood of misidentification") (citation omitted). "In determining `whether under the "totality of the circumstances" the identification was reliable even though the confrontation procedure was suggestive * * * the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.'" State v. Keith, 79 Ohio St.3d 514, 523,1997-Ohio-367, citing Neil v. Biggers (1972), 409 U.S. 188, 199;State v. Broom (1988), 40 Ohio St.3d 277, 284, citing Manson v.Brathwaite (1977), 432 U.S. 98, 114.
 {¶ 47} In the present case, the procedures in the identifications used were not unnecessarily suggestive, nor were the identifications unreliable. Although Bandy's face is slightly larger than that of the other persons represented, Bandy is incorrect that the complexion of the others is darker than his. A review of the photo array, which was presented to the jury, demonstrates that Bandy has neither the darkest nor the lightest complexion represented. Moreover, all the persons represented share some physical *Page 16 
characteristic with Bandy, such as similar facial hair or structure.State v. Davis, 76 Ohio St.3d 107, 112, 1996-Ohio-414 ("[a] defendant in a lineup need not be surrounded by people nearly identical in appearance") (citation omitted).
 {¶ 48} Likewise, the statement that the suspect was in the array, made by the prosecutor who showed Trench the photo array, does not render the identification invalid. "A police statement that the picture of a suspect was among those in the array [i]s not impermissibly suggestive. It seems not unreasonable for a witness to assume that any time police show a photo array, one of the pictures there is of an individual of police interest." State v. Starks, 6th Dist. Nos. L-05-1417 and L-05-1419, 2007-Ohio-4897, at ¶ 33; cf. State v. Jones, 8th Dist. No. 85025, 2005-Ohio-2620, at ¶ 17 (detective's statement that one of the six men in the photo array was a suspect rendered the identification suggestive). In this case, Bandy was a suspect in another case having similar circumstances and the photo array was created without regard for Trench's description of the perpetrator's physical characteristics. Since Bandy was not yet a suspect in Trench's case, Trench was under no illusions that the persons he viewed in the array were chosen based on his description of the perpetrator.
 {¶ 49} Bandy also raises the argument that the photo array should have contained a picture of Bandy's brother, Rashad. Following Bandy's arrest, the police obtained multiplex video from the Bureau of Motor Vehicles' branch where Wilson had registered the title to Gibson's motorcycle. In the video, Rashad is seen accompanying Wilson. Given Rashad's connection with Wilson and the similarity of the brothers' appearance, Bandy maintains Gibson and Trench should have viewed Rashad's image in the array. *Page 17 
 {¶ 50} There are several problems with this argument. The first is that Rashad did not become a suspect until after Bandy's arrest and after the initial identifications by Gibson and Trench. Moreover, although it is claimed that Rashad and Bandy have similar appearances, Rashad is several inches taller than Bandy and, thus, does not meet the physical description given by Gibson and Trench. As a practical matter, Gibson and Trench viewed pictures of Rashad outside of the photo array and concluded that the two brothers were easily distinguishable despite some similarity.
 {¶ 51} Bandy claims trial counsel was deficient for not summoning Detective Bowersock as a witness to explain how the array was created. How the array was created, however, is not relevant in this case. The array itself was in evidence for the jury to consider and the circumstances in which the identifications took place were fully explained by the witnesses at trial. Any suggestiveness in the identifications would be evident from the array and the manner in which it was employed, not in the manner of its creation.
 {¶ 52} Finally, Gibson and Trench's identification of Bandy carry strong indicia of reliability. Both Gibson and Trench spoke with Bandy for five to ten minutes during daylight hours. In both cases, Bandy was identified within three weeks of the thefts. Both Gibson and Trench professed a high degree of certainty that Bandy was the perpetrator.
 {¶ 53} Since the circumstances surrounding the identifications were not unnecessarily suggestive and the identifications themselves bear a high degree of reliability, their suppression was not warranted. The issues Bandy raises regarding the procedures used in the identifications were factors for the jury to consider in determining *Page 18 
the weight to be given to the identifications. State v. Wills (1997),120 Ohio App.3d 320, 325 ("[i]f the pretrial procedures were not suggestive, any remaining questions as to reliability go to the weight of the identification, not its admissibility, and the identification is generally admissible without any further reliability inquiry") (citation omitted). Thus, Bandy was not prejudiced by trial counsel's failure to file a timely motion to suppress with respect to the eyewitness identifications.
 {¶ 54} A second suppression issue exists regarding Bandy's written statement, which was read into the record by Detective Kroczak. Bandy's trial counsel made no attempt, timely or otherwise, to suppress the written statement. Bandy maintains on appeal that the written statement should have been suppressed on the grounds that officers did not Mirandize him before taking the statement, and that its introduction was prejudicial.
 {¶ 55} In Miranda v. Arizona (1966), 384 U.S. 436, the United States Supreme Court held: "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. at 444.
 {¶ 56} "[P]olice officers are not required to administerMiranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because * * * the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's *Page 19 
freedom as to render him `in custody.'" Oregon v. Mathiason (1977),429 U.S. 492, 494 (citation omitted).
 {¶ 57} In the present case, the following circumstances regarding the production of the written statement were adduced at trial. Officers met Bandy at his or his mother's home and questioned him about Gibson's motorcycle for about twenty to thirty minutes. Bandy initially denied knowing anything about the motorcycle. Bandy became belligerent because Detective Bowersock had called him "Rafiki" and because of the officers' presence on his property. Unknown persons summoned local police who arrived on the scene and remained for five to ten minutes. The police also ran information about a motorcycle found in the garage through the LEADS system.
 {¶ 58} Detective Kroczak testified as follows:
 {¶ 59} Kroczak: "I mean, it wasn't anything like a major fight, but slightly standoffish and combative, you know."
 {¶ 60} Attorney: "Nothing physical, right?"
 {¶ 61} Kroczak: "No. Slightly, slightly physical, you know, where Rafik didn't want to cooperate at that point, at which point Detective Bowersock placed him in handcuffs."
 {¶ 62} Attorney: "Cooperate how?"
 {¶ 63} Kroczak: "He was just standoffish. He was like, basically, `you're not talking to me; you're not arresting me.' Stuff like that and, you know."
 {¶ 64} Attorney: "So when someone says they don't want to talk to you and they don't want to be arrested, they get handcuffed?"
 {¶ 65} Kroczak: "If we have probable cause, at which point we believed we did." *Page 20 
 {¶ 66} Attorney: "Okay, and that's what you say about being uncooperative. He didn't want to talk to you guys."
 {¶ 67} Kroczak: "No, he was actually — there was actually, I believe, a pushing match in the garage between him and Officer Bowersock."
 {¶ 68} Attorney: "Okay, and that's when Officer Bowersock placed him in handcuffs?"
 {¶ 69} Kroczak: "Yes."
 {¶ 70} Attorney: "Okay. And then up until that time, Rafik still says he doesn't know what's going on, right?"
 {¶ 71} Kroczak: "Correct."
 {¶ 72} Attorney: "And he only decides to make some statement once he's taken out of handcuffs, correct?"
 {¶ 73} Kroczak: "Yea."
 {¶ 74} According to Bandy's written statement, Detective Bowersock handcuffed him without provocation and said he was going to take Bandy to jail. Also, according to the written statement, Bandy asked to be read his rights if he was under arrest and it was only after he told the officers about the man in the park that he was released from the handcuffs and asked to make a written statement.
 {¶ 75} Although conflicting in certain respects, this evidence was sufficient to warrant a motion to suppress the written statement on the grounds that Bandy's statement was less than voluntary and taken without the Miranda warnings being given. The written statement is somewhat prejudicial because in it Bandy admits to having had *Page 21 
possession of the title to Gibson's motorcycle. It is also prejudicial because the account of how Bandy acquired title is suspicious and casts Bandy in a doubtful light.
 {¶ 76} Nonetheless, the prejudice in allowing the written statement into evidence does not outweigh the reliability of the eyewitness identification of Bandy by Gibson and Trench. Ultimately, whether Bandy ever possessed title to Gibson's motorcycle is irrelevant to the charges against him, which arise from the delivery of the fraudulent cashier's check in Gibson's case and the negotiation of the sale in Trench's case. Since these identifications stand independent of the incident that occurred at Bandy's residence and the written statement provided, the suppression of the written statement would not have altered the outcome of Bandy's trial.
 {¶ 77} Bandy argues that trial counsel was ineffective for failing to object to prejudicial testimony at trial. Specifically, Gibson was allowed to testify that he was going to use the money from the sale of the motorcycle to do work on his home and to pay a debt back to this father. Trench was allowed to testify that he had served in Iraq before trial counsel raised an objection on the grounds of relevance. While the testimony regarding Gibson's intentions for the money he would have made from the sale and Trench's military service is not relevant, neither is it inflammatory or prejudicial.
 {¶ 78} Finally, Bandy argues trial counsel was ineffective for failing to request a jury instruction on identification or "eyewitness testimony," in light of the importance of Gibson and Trench's identifications to the State's case.
 {¶ 79} The following instruction on "eyewitness testimony" is provided by Ohio Jury Instructions: "Some things you may consider in weighing the testimony of identifying witness(es) are: *Page 22 
 {¶ 80} Capacity of the witness, that is, the (age) (intelligence) (defective senses, if any,) and the opportunity of the witness to observe.
 {¶ 81} The witness' degree of attention at the time he observed the offender.
 {¶ 82} The accuracy of witness' prior description (or identification, if any).
 {¶ 83} Whether witness had had occasion to observe defendant in the past.
 {¶ 84} The interval of time between the event and the identification.
 {¶ 85} All surrounding circumstances under which witness has identified defendant (including deficiencies, if any, in lineup, photo display or one-on-one).
 {¶ 86} If, after examining the testimony of the identifying witness you are not convinced beyond a reasonable doubt the defendant is the offender, you must find defendant not guilty." 4 Ohio Jury Instructions (2007) 41, Section 405.20(5).
 {¶ 87} A trial court, however, is not required to give this instruction, even if properly requested. "A trial court is not required in all criminal cases to give a jury instruction on eyewitness identification where the identification of the defendant is the crucial issue in the case and is uncorroborated by other evidence. A trial court does not abuse its discretion in deciding that the factual issues do not require, and will not be assisted by, the requested instructions, and that the issue of determining identity beyond a reasonable doubt is adequately covered by other instructions." State v. Guster (1981),66 Ohio St.2d 266, at syllabus.
 {¶ 88} In the present case, there is no particularized need for a specific instruction on identification. As noted above, Gibson and Trench's identification of Bandy were reliable under the totality of the circumstances. Neither Gibson nor Trench suffered from any lack of capacity or ability to observe the perpetrator. Both witnesses *Page 23 
observed Bandy, speaking and interacting with him, for several minutes under optimal daylight conditions. Bandy matches the physical description of the perpetrator given by the witnesses and both witnesses demonstrated a high degree of certainty in their identification. Moreover, the identification occurred within weeks of the crimes.
 {¶ 89} It is also recognized that "[a]n attorney's decision not to request a particular jury instruction is a matter of trial strategy and does not establish ineffective assistance of counsel." State v.Morris, 9th Dist. No. 22089, 2005-Ohio-1136, at ¶ 100 (citations omitted). Given the favorable conditions in which Gibson and Trench observed Bandy and the high level of certainty in their identifications, the decision not to request further instruction on identification can be considered trial strategy, inasmuch as such instruction could have bolstered strength of the identifications.
 {¶ 90} Bandy argues there are factors rendering the identifications doubtful, such as the fact that both witnesses described the perpetrator as wearing a hat and sunglasses. These circumstances, however, were adequately addressed in the court's instruction to the jury on the tests for evaluating witness credibility. The trial court instructed the jury as follows: "To weigh the evidence, you must consider the credibility of the witnesses. You will apply the tests of truthfulness which you apply in your daily lives. These tests include how each witness appears upon the witness stand, how the witness testifies, how reasonable is the testimony, the opportunity the witness had to see, hear and know the things concerning which the witness testified, how accurate is the witness's memory, whether the witness appears frank in his or her testimony, the witness's intelligence and any interest and bias on the part of the witness, together with all the facts and circumstances surrounding the testimony. Applying these tests, you *Page 24 
will assign to the testimony of each witness such weight as you deem proper." Cf. 4 Ohio Jury Instructions (2007) 41, Section 405.20(3).
 {¶ 91} Given the circumstances of the identifications and the trial court's actual instruction to the jury, Bandy cannot demonstrate any prejudice resulting from counsel's failure to request an instruction on identification.
 {¶ 92} We have considered all the alleged instances of ineffective assistance of counsel and found that no single instance is so prejudicial as to render the outcome of the trial doubtful, and, thus, require reversal. We will now consider whether the alleged errors, considered cumulatively, demonstrate constitutionally ineffective assistance of counsel.
 {¶ 93} When considering a claim of ineffective assistance, it is proper to consider "the cumulative effect of trial counsel's errors."State v. Gondor, 112 Ohio St.3d 377, 2006-Ohio-6679, at ¶ 72; State v.Goff, 82 Ohio St.3d 123, 140, 1998-Ohio-369 ("multiple errors that are separately harmless may, when considered together, violate a person's right to a fair trial in the appropriate situation"). "Strickland directs us to look at the `totality of the evidence before the judge or jury,' keeping in mind that `[s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture * * *.'" Gondor, 2006-Ohio-6679, at ¶ 72, citing Strickland, 466 U.S. at 695-696. However, "errors cannot become prejudicial by sheer weight of numbers." State v. Hill,75 Ohio St.3d 195, 212, 1996-Ohio-222 (citation omitted).
 {¶ 94} As demonstrated above, the majority of the alleged deficiencies lacked substance as falling below the standard for constitutionally effective representation or *Page 25 
prejudicial effect. None of the untimely pre-trial motions had arguable merit and those motions did not affect the outcome of the trial. Similarly, the failure to object to certain irrelevant testimony and to request an identification instruction are of minor importance and, when considered along with other alleged deficiencies, do not gain greater significance. The most substantial failing of trial counsel was to suppress Bandy's written statement. The effect of this failure, however, is negated by the strength of Gibson and Trench's identification of Bandy as the perpetrator. As noted above, Bandy's written statement and the events at his residence were ancillary to the convictions, which are based solely on his interactions with Gibson and Trench. More importantly, the written statement has no bearing on the accuracy of the eyewitness identifications. Considering the totality of the circumstances in this case, Bandy received effective assistance of counsel as guaranteed by the Ohio and United States Constitutions.
 {¶ 95} The second assignment of error is without merit.
 {¶ 96} For the foregoing reasons, the judgment of the Lake County Court of Common Pleas, finding Bandy guilty of two counts of Grand Theft and one count of Forgery, is affirmed. Costs to be taxed against the appellant.
CYNTHIA WESTCOTT RICE, J., concurs, COLLEEN MARY O'TOOLE, J., dissents. *Page 1