[Cite as *State v. Ramos*, 2026-Ohio-2258.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## TRUMBULL COUNTY

| | |
|---|---|
| STATE OF OHIO, | CASE NO. 2025-T-0049 |
| Plaintiff-Appellee, | |
| - vs - | Criminal Appeal from the Court of Common Pleas |
| WILLIAM RAMOS, | |
| Defendant-Appellant. | Trial Court No. 2025 CR 00226 |

## OPINION AND JUDGMENT ENTRY

Decided: June 15, 2026
Judgment: Reversed and vacated

*Dennis Watkins*, Trumbull County Prosecutor, and *Charles L. Morrow*, Assistant Prosecutor, Administration Building, Fourth Floor, 160 High Street, N.W., Warren, OH 44481 (For Plaintiff-Appellee).

*Michael A. Partlow*, P.O. Box 1562, 3435 Kent Road, Stow, OH 44224 (For Defendant-Appellant).

EUGENE A. LUCCI, J.

{¶1}     Appellant, William Ramos, appeals the judgment of the Trumbull County Court of Common Pleas, convicting him on one count of improperly discharging a firearm at or into a habitation, in violation of R.C. 2923.161(A)(1) and (C), a felony of the second degree. At issue is whether the jury's verdict and ultimate conviction were supported by sufficient evidence. We conclude the State did not meet its burden of production to obtain a conviction, and therefore the conviction entered by the trial court is reversed and vacated.

{¶2}    On February 23, 2025, Kaitlyn Speakman, Mr. Ramos' ex-girlfriend, was at the apartment Mr. Ramos shared with a third party. Ms. Speakman remained friends with Mr. Ramos even though they were not dating at the time of the incident. That day, Ms. Speakman attempted to leave Mr. Ramos' apartment, but he objected. He did not want Ms. Speakman to leave and would not allow her to take her purse. Ms. Speakman eventually left the apartment without the purse.

{¶3}    Later that evening, Ms. Speakman and a friend, Calvin Johnson, were "Door-dashing" to make some extra money. Mr. Johnson had a Dodge Charger that he transported himself and Ms. Speakman to accommodate Door-dash clients. Ms. Speakman, however, needed her purse to give Mr. Johnson money for driving. They consequently returned to Mr. Ramos' apartment to retrieve Ms. Speakman's purse.

{¶4}    Ms. Speakman entered the apartment building, which included six, discrete units. Mr. Ramos asked Ms. Speakman who she was with and, when she told him Mr. Johnson drove her to the apartment, Mr. Ramos threatened to shoot both individuals. Ms. Speakman continued to ask for her purse, but Mr. Ramos refused to return the item. She tried to leave the apartment but was blocked by Mr. Ramos. She eventually sat down on a couch, at which point Mr. Ramos retrieved a 12-gauge shotgun and stood at the threshold of the apartment with the door opened. Ms. Speakman stated she "wasn't really shocked when he pulled [the shotgun] out." Nevertheless, she stated "[a]re you really going to do this? Like, stop."

{¶5}    Mr. Ramos fired one shot from the 12 gauge in a direction which struck the outside of the entrance/exit door to the building. Police later found buck-shot evidence in the wall and/or door frame of the entrance/exit door. Critically, Ms. Speakman testified

Case No. 2025-T-0049

that at the time of the discharge, Mr. Ramos had extended the gun into the common hallway of the building—not merely standing at the threshold of his apartment unit. Specifically, Ms. Speakman testified "he went to the door . . . [a]nd then shot off the gun . . . with his arm out the door to the front door towards the front door." The gun was therefore already inside the hallway of the building when the shot was fired. It is uncontroverted he did not shoot at another apartment, nor did he aim at Ms. Speakman.

{¶6} After discharging the shotgun, Mr. Ramos walked away from the apartment's front door, and Ms. Speakman left in the vehicle with Mr. Johnson. An unidentified individual called police reporting "shots fired" in the apartment building.

{¶7} Officer Tyler George of the Warren Police Department responded to the call. When he arrived at the building, the officer observed a vehicle leaving the apartment building. The vehicle was ultimately stopped by another officer. Mr. Johnson was the driver, and Ms. Speakman was the passenger. Both were questioned about the incident.

{¶8} Officer George proceeded into the apartment building. He located Mr. Ramos' apartment and knocked on the door but received no response. The officer decided to enter the apartment and observed another tenant in the living area. Mr. Ramos, who was in the shower, eventually appeared. A search of the room in which Mr. Ramos was staying revealed a 12-gauge shotgun which had a spent shell casing in it.

{¶9} Officer George observed "wadding" and "bullet holes . . . from buckshot or little BBs" on the inside of the entrance/exit door to the building. There was no evidence that any shot was fired from outside of the building.

{¶10} Mr. Ramos was indicted on one count of improperly discharging a firearm at or into a habitation, in violation of R.C. 2923.161(A)(1) and (C), a felony of the second

Case No. 2025-T-0049

degree, and two counts of aggravated menacing, in violation of R.C. 2903.21(A) and (B), misdemeanors of the first degree.

{¶11} Mr. Ramos pleaded not guilty to the charges. The State offered a plea agreement wherein Mr. Ramos would plead guilty to the two aggravated menacing counts (one against Ms. Speakman and one against Mr. Johnson). The trial court, however, rejected the proposed plea stating: "No. No. That's not going to happen when a gun is used in an apartment where people are living. You're not pleading to aggravated menacing in this court." At this hearing, defense counsel moved to dismiss the discharging-firearms count, arguing the State lacked prima facie evidence to proceed on that count given the plain language of the statute. The State conceded that the only evidence it had was Mr. Ramos discharging a firearm *from* the hallway, outside of his apartment and not into another apartment from the outside of the building. The trial court denied the motion.

{¶12} On June 5, 2025, the trial court issued its judgment overruling the joint motion to dismiss the discharging-firearms count. The trial court acknowledged Mr. Ramos "fired a shotgun while inside the doorway of the apartment building when the shot was fired." The trial court determined that Mr. Ramos "fired the shotgun from inside the doorway of the apartment, however, he also fired the shot 'at or into an occupied structure' as the shot went into the hallway of an apartment building that is occupied by others. An occupant of the apartment building could have been killed or seriously injured had they entered that hallway."

{¶13} On June 6, 2025, the State moved the trial court, in writing, for reconsideration of its judgment denying the motion for dismissal. The motion was

Case No. 2025-T-0049

apparently orally joined by the defense. In its written motion, the State emphasized that Mr. Ramos' "gun was never pointed at an individual. The gun was never pointed at a specific apartment. The gun was shot from [Mr. Ramos'] premises from inside to the door leading outside the apartment building." Under the circumstances, the State submitted that "the statute, and legislative intent are contrary to the evidence in this case thus the State reasonably believes it would be unable to legally prove [Mr. Ramos'] guilt by proof beyond a reasonable doubt at trial as to Count [One] of the indictment."

{¶14} After holding a hearing on the motion to reconsider, the trial court overruled the motion. The trial court, from the bench, stated:

> I think that's an issue for the Court of Appeals to deal with, whether there was legislative intent and whether - - my personal feeling is that I don't know what world we live in if we can shoot out of an apartment into the entry and not have some sort of culpability in the crime. I don't know if it fits this particular statute, but that's something for the Court of Appeals to deal with.

{¶15} The matter proceeded to jury trial, at which the State presented evidence from Ms. Speakman and Officer George. At the conclusion of the State's case, Mr. Ramos, via counsel, moved for acquittal on all counts. The trial court granted the motion as to the aggravated menacing count pertaining to Mr. Johnson. The trial court, however, overruled the motion on the remaining aggravated-menacing count pertaining to Ms. Speakman and the improperly-discharging-a-firearm count. Specifically, the trial court determined:

> Regarding the firearm, improperly handling a firearm by shooting in or at the habitation, this court considers the other cases that you've spoken of as distinctively different because the majority of those were standalone homes. You know, you can use a gun and shoot in your own home outside in the yard or inside. But it's very different when, one, there's a tenant in

Case No. 2025-T-0049

his own apartment - - in the apartment that Mr. Ramos is staying at. I don't know if he has any legal interest in that property at all.

He was staying at that bedroom for that day, from what - - is all the evidence I heard, with his girlfriend. And there was evidence that he went and took a shotgun, went to the hallway of his apartment - - of that apartment unit, and then shot into the hallway of the apartment building, which has six units. And I consider the hallway of the apartment building also part of the habitation of the individuals who live there, including the legal tenant of the property that [Mr. Ramos] was in, as well as the other units.

He shot at the front door, which is also an exit door. The bullet was found - - or bullet fragments were found, the wad, at the exit door. The shotgun was found. It was examined. I think there's sufficient evidence for that to go to the jury.

{¶16} After closing arguments and the trial court's jury instructions, appellant was acquitted of the aggravated menacing charge against Ms. Speakman but found guilty of the improperly-discharging-a-firearm count. The trial court ordered a presentence investigation report and ultimately sentenced Mr. Ramos to an indefinite prison term of two years and a maximum of three years.

{¶17} This appeal follows.

{¶18} Mr. Ramos assigns the following as error:

{¶19} "Appellant's conviction was not supported by sufficient evidence."

{¶20} A "sufficiency" argument raises a question of law as to whether the prosecution offered some evidence concerning each element of the charged offense. *State v. Windle,* 2011-Ohio-4171, ¶ 25 (11th Dist.). "[T]he proper inquiry is, after viewing the evidence most favorably to the prosecution, whether the jury could have found the essential elements of the crime proven beyond a reasonable doubt." (Citation omitted.) *State v. Troisi,* 2008-Ohio-6062, ¶ 9 (11th Dist.). "'Sufficiency of the evidence

Case No. 2025-T-0049

tests the burden of production.'" *State v. Rice*, 2019-Ohio-1415, ¶ 65 (11th Dist.), quoting *State v. McFeely*, 2009-Ohio-1436, ¶ 23 (11th Dist.).

{¶21} Mr. Ramos was indicted for violating R.C. 2923.161, which provides, in pertinent part:

> (A) No person, without privilege to do so, shall knowingly do any of the following:
>
> (1) Discharge a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual. . . .

{¶22} Mr. Ramos challenges the State's failure to produce evidence that he knowingly, without privilege to do so, discharged a firearm *at or into* an occupied structure. After reviewing the caselaw and the statutory language in full context, we agree with Mr. Ramos.

{¶23} At first, it would appear that Mr. Ramos' act of firing his shotgun in the direction of the common area of his apartment residence could meet the requirements of the prepositions "at" or "into" in the disjunctive phrase "at or into" included in the indicted charge. A closer examination of the statute in its entirety, however, demonstrates the legislature's intention to criminalize the discharge of a firearm when it is shot from the *outside* of an occupied structure and therefore the "at or into" element is not (necessarily) met when one shoots from inside of an occupied structure.

{¶24} Mr. Ramos points out that R.C. 2923.161(A)(2), the subsection immediately following the section with which he was charged, provides that no person, without privilege, shall knowingly "[d]ischarge a firearm *at, in, or into* a school safety zone. . . ." (Emphasis added.) He underscores that the inclusion of the preposition "in," under subsection (A)(2), demonstrates the legislature's intention to criminalize the discharge of

Case No. 2025-T-0049

a firearm that actually takes place *inside* a school safety zone. The General Assembly's decision not to utilize the word "in" under subsection (A)(1), evinces an intent, therefore, not to criminalize the discharge of a firearm from inside an occupied structure that would otherwise meet the other elements of the crime.

{¶25} By using specific language in subsection (A)(2), but omitting that language from (A)(1), Mr. Ramos argues the legislature unequivocally drafted the statute to specifically require any charge under subsection (A)(1) be supported by evidence that the defendant discharged the firearm from *outside* an occupied structure. In other words, by employing certain language in one instance, and different language in another, the legislature indicated different results were intended.

{¶26} "The primary goal of statutory construction is to ascertain and give effect to the legislature's intent in enacting the statute." *State v. Lowe*, 2007-Ohio-606, ¶ 9, citing Brooks *v. Ohio State Univ.*, 111 Ohio App.3d 342, 349 (10th Dist. 1996). "The court must first look to the plain language of the statute itself to determine the legislative intent." *Lowe* at ¶ 9, citing *State ex rel. Burrows v. Indus. Comm.,* 1997-Ohio-310, ¶ 10. We apply a statute as it is written when its meaning is unambiguous and definite. *Portage Cty. Bd. of Commrs. v. Akron,* 2006-Ohio-954, ¶ 52, citing *State ex rel. Savarese v. Buckeye Local School Dist. Bd. of Edn.*, 1996-Ohio-291, ¶ 7. "An unambiguous statute must be applied in a manner consistent with the plain meaning of the statutory language." *Lowe* at ¶ 9, citing *Burrows* at ¶ 10.

{¶27} In light of the legislature's use of different, additional language under subsection R.C. 2923.161(A)(2) that captures a separate actus reus than that criminalized under (A)(1), we conclude the latter subsection unambiguously contemplates an actus

Case No. 2025-T-0049

reus that, in most cases, including the instant matter, must occur *outside* an occupied structure. *See* footnote one below. This analysis finds support in other appellate districts.

{¶28}  First, in *State v. Nash*, 2003-Ohio-230 (5th Dist.), the Fifth Appellate District was faced with a similar argument. In recognizing that subsection R.C. 2923.161(A)(1) limited its verbiage to the discharge of a firearm "at or into" an occupied structure, and subsection R.C. 2923.161(A)(2) used the more expansive language of "at, in, or into," the court concluded subsection (A)(1) required evidence that the firearm was discharged from the outside of an occupied structure. Specifically, the court determined:

> R.C. 2923.161(A)(1) prohibits an individual from discharging a firearm "at or into an occupied structure". In contrast, subsection (A)(2) of R.C. 2923.161(A)(2) prohibits an individual from discharging a firearm "at, *in* or into" a school safety zone. (Emphasis added). Had the drafters of R.C. 2923.161 intended to prohibit discharging a firearm *in* a habitation, they could have, and presumably would have, included the same language in subsection (A)(1) as in (A)(2). The expression of one thing implies the exclusion of another ("expressio unius est exclusio alterius"). See, e.g., *Green, Inc. v. Smith* (1974), 40 Ohio App.2d 30, 32, 317 N.E.2d 227, 229. Since the word "in" is not contained in R.C. 2923.161(A)(1) and since there is no evidence that appellant discharged his firearm at or into a habitation, appellant's conviction for improperly discharging a firearm at or into a habitation is against the manifest weight of the evidence.

(Footnote omitted.) *Nash* at ¶ 17.

{¶29}  Similarly, in *State v. Moorer*, 2008-Ohio-2560 (1st Dist.), the appellate court, citing *Nash* with approval, concluded that reading the statute "as a whole" supports the conclusion that the plain language of subsection R.C. 2923.161(A)(1) requires "the proscribed conduct of 'discharging a firearm' must occur from outside the dwelling that is first fired 'at or into.'" *Moorer* at ¶ 5 and 4 (respectively). The First District observed that it agreed with the court in *Nash* that the General Assembly could have included the word

Case No. 2025-T-0049

"in" under subsection (A)(1) but did not. *Id.* at ¶ 5. As such, the court determined that criminalizing conduct occurring inside an occupied dwelling was contrary to statutory intent. *See Id.* at ¶ 6.

{¶30} "At or into" an occupied structure does not necessarily incorporate an act that occurs specifically "in" an occupied structure. In light of what R.C. 2923.161 is designed to criminalize (namely, the knowing discharge of a firearm under specific circumstances), we conclude that the legislature intended only to prohibit the discharge of a firearm, in cases such as this one, from the outside of an occupied dwelling.[1]

{¶31} This plain-meaning, which incorporates a directional reading of the phrase "at or into," finds additional persuasive support in *Commonwealth v. McCoy*, 928 A.2d 306 (Pa. Super. 2007), aff'd in part, 962 A.2d 1160 (Pa. 2009).

{¶32} In *McCoy*, the court applied the ordinary meaning of "into—"movement from outside to inside—and held that the defendant did not discharge a firearm "into" an occupied structure because he was already inside when he fired. (Justice Antonin Scalia and Bryan Garner cite *McCoy* with approval as an application of plain meaning to directional prepositions. A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 11–13 (2012)). The directional logic of *McCoy* applies equally here: the prepositions "at" and "into" in R.C. 2923.161(A)(1) require the discharge to originate from outside the occupied structure, and a shot cannot travel "at or into" a structure from a position already inside it.

---

1. It is worth pointing out that, had the weapon been discharged into the common area, penetrated the wall or door, and struck (or was knowingly directed at or into) a different occupied structure, subsection R.C. 2923.161(A)(1) may very well prohibit such conduct. These are not, however, the facts of the underlying case. Mr. Ramos' shotgun was fired from the inside of the building near the threshold door of his apartment toward the exit/entry way of the building. There was simply no evidence that he knowingly fired the weapon "at or into" another occupied structure.

Case No. 2025-T-0049

{¶33} Further, although not oft-cited, the "whole-statute" canon of construction is "the fundamental rule of statutory construction that a statute is to be read and construed as a whole so as to harmonize and give effect to all its parts." *State v. Friese*, 959 N.W.2d 205, 212 (Sup.Ct. Minn., 2021). The "whole-statute" canon may be considered without first finding the underlying statute ambiguous (unlike the in pari materia canon of construction). *State v. Riggs*, 865 N.W.2d 679, 683 (Minn. 2015). *See also State v. Bee*, 5 N.W. 3d 713, 720 (Minn. 2024) ("The whole-statute canon recognizes that it is appropriate to 'construe a statute as a whole and interpret its language to give effect to all of its provisions.'" (Citation omitted.)). A statute must be observed fully. Here, the "whole statute" demonstrates the legislature did not criminalize an act in the underlying indictment.

{¶34} This conclusion is not altered by R.C. 2909.01(C)(4), which defines "occupied structure" to include "a portion of a building" in which any person is present or likely to be present. The trial court reasoned that the common hallway of the apartment building qualified as a portion of an occupied structure and that Mr. Ramos therefore discharged his firearm "at or into" that structure. This reasoning conflates two distinct elements of the offense. The definition of "occupied structure" governs the nature of the target—it identifies what qualifies as the structure at or into which the firearm must be discharged. The prepositions "at or into" govern the actus reus—the directionality of the discharge in relation to that structure.

{¶35} Even, assuming arguendo, that the common hallway constitutes a "portion of" the occupied structure for definitional purposes, this does not alter the directional requirement imposed by the prepositions. Mr. Ramos fired the gun from within the same

Case No. 2025-T-0049

occupied structure he is alleged to have targeted. Indeed, as established by Ms. Speakman's testimony, the gun was extended into and discharged from within the hallway itself—a portion of the structure that the State claims was the target of the discharge. The breadth of R.C. 2909.01(C)(4), which defines an "occupied structure," expands what counts as the target; it does not relocate the shooter. These two components of the statute operate on separate elements of the offense and the plain-language application of both, read together, compels the same result.

{¶36} Two final points require attention. In overruling the joint motion to dismiss, the trial court first stated, "I don't know what world we live in if we can shoot out of an apartment building into the entry and not have some culpability in the crime. I don't know if it fits this particular statute, but that's something for the Court of Appeals to deal with."

{¶37} A court applies the law as written and, even though Mr. Ramos' actions were clearly problematic, they simply do not meet the elements of R.C. 2923.161(A)(1) under these facts. The facts of this case do not fit within this specific statute; it does not, however, imply that a different charge may have corresponded with the facts of this case.

{¶38} We further note that the controlling factual distinction—the gun's position inside the building's common hallway at the moment of discharge—was not argued with particularity by either party in the trial court. Mr. Ramos' appellate brief addressed the statutory construction question without developing this factual predicate with the specificity the record supports. Given the manner in which the case was presented and argued, the trial court's analysis was understandable on the record before it. The nuanced factual and statutory distinctions that ultimately control our analysis emerged more fully in the context of appellate review.

{¶39} Further, the trial court, after considering defense counsel's motion for acquittal, also observed that the cases counsel cited in support of his motion (principally *Nash* and *Moorer*) dealt with standalone homes. The court found this distinction meaningful because other tenants were in the apartment building at the time of the conduct, and hence Mr. Ramos' act of discharging the firearm from inside the building should be excluded from the scope of the statutory analyses of those cases. We consider, however, the nature of the residence, whether a standalone home or an apartment, to be a distinction without difference.

{¶40} As discussed above, the "portion of" language in R.C. 2909.01(C)(4) applies with equal force to any occupied structure, including standalone homes, which likewise contain rooms, hallways, and other interior spaces. The multi-unit character of the apartment building does not render the definitional analysis under R.C. 2909.01(C)(4) uniquely applicable to Mr. Ramos' circumstances; the same analysis would govern had he fired from one room of a single-family dwelling into a hallway within that same structure. The critical question under R.C. 2923.161(A)(1) is the directionality of the discharge in relation to the occupied structure—governed by the prepositions "at or into"—and that question is answered identically regardless of building type.

{¶41} Considering the language of the statute and its subsections, we conclude the State failed to adduce sufficient evidence to support the conviction of discharging a firearm, in violation of R.C. 2923.161(A)(1). Analyzing the plain language of the statute, Mr. Ramos did not fire the shot "at or into" an occupied structure.

{¶42} Mr. Ramos' assignment of error has merit.

Case No. 2025-T-0049

{¶43} The judgment of the Trumbull County Court of Common Pleas is reversed and the conviction is vacated.

MATT LYNCH, P.J.,

SCOTT LYNCH, J.,

concur.

Case No. 2025-T-0049

# JUDGMENT ENTRY

For the reasons stated in the opinion of this court, appellant's assignment of error is with merit. It is the judgment and order of this court that the judgment of the Trumbull County Court of Common Pleas is reversed and the conviction is vacated.

Costs to be taxed against appellee.

_____
JUDGE EUGENE A. LUCCI

_____
PRESIDING JUDGE MATT LYNCH,
concurs

_____
JUDGE SCOTT LYNCH,
concurs

---

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.

---

Case No. 2025-T-0049